UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MIGUEL ARCE,

*Plaintiff*,

– against –

COMMISSIONER OF SOCIAL SECURITY,

*Defendant*.

**MEMORANDUM & ORDER**
25-cv-06291 (NCM)

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Miguel Arce brings this action against defendant Commissioner of the Social Security Administration ("Commissioner") seeking judicial review of the Commissioner's decision denying plaintiff's application for disability insurance and supplemental security income benefits. *See* Compl. ¶¶ 1, 4, 7, ECF No. 1. Before the Court are plaintiff's motion for judgment on the pleadings ("Mot."), ECF No. 10-1, and the Commissioner's cross-motion for judgment on the pleadings ("Cross-Mot."), ECF No. 13-1. For the reasons stated below, plaintiff's motion is **GRANTED** in part and **DENIED** in part, and the Commissioner's cross-motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

Plaintiff protectively filed for supplemental security income and disability insurance benefits on September 11, 2023, alleging a disability onset date of September 5, 2023. Certified Administrative Record ("R.") 17, ECF No. 7; *see also* Joint Stipulation of

Relevant Facts ("Joint Stip.") 2, ECF No. 13.[1] The basis for plaintiff's initial application was asthma and pulmonary embolism. R. 63. The Commissioner denied plaintiff's application on February 1, 2024. R. 66–67. Plaintiff thereafter sought reconsideration, alleging that his condition had worsened and adding a new allegation of depression. R. 68–75. On May 13, 2024, plaintiff's application was again denied. R. 76; *see* Joint Stip. 2. Plaintiff requested a hearing, R. 97, which was held telephonically on February 4, 2025 ("Hearing"), before an Administrative Law Judge ("ALJ"). R. 37–62; *see* Joint Stip. 2.

Relevant to the parties' current dispute, the administrative record of plaintiff's benefits proceedings includes medical records of plaintiff's various visits to Wyckoff Heights Medical Center and Wyckoff Heights Medical Center Clinic between September 5, 2023 and December 27, 2024, as well as five opinions from the Social Security Administration ("Commission") and state agency consultants: (1) Dr. Ioanis Atoynatan, a consultative examiner for the Commission; (2) Dr. Aris Peguero, another consultative examiner for the Commission; (3) Dr. S. Putcha, a state agency consultant; (4) Dr. A. Periakaruppan, a state agency consultant; and (5) Dr. M. Juriga, a state agency consultant. *See* Joint Stip. 2–10. In addition, the record before the ALJ included plaintiff's testimony at the Hearing. *See* R. 43–46, 47–56, 60–62; *see also* Joint Stip. 10.

*A. Plaintiff's Treatment at Wyckoff Heights Medical Center and Clinic*

On September 5, 2023, plaintiff was admitted to Wyckoff Heights Medical Center with symptoms of shortness of breath, palpitations, and difficulties breathing associated with leg swelling and fainting episodes. Joint Stip. 2–3; R. 346–47. Plaintiff underwent

---

[1] Throughout this Order, page numbers for the Certified Administrative Record ("R.") refer to the numbers found in the bottom right corner of each page, rather than the page numbers assigned by the Electronic Case Filing system ("ECF"). All other page numbers for docket filings refer to the page numbers assigned by ECF.

surgery to remove a large blood clot and remained at the hospital until September 9, 2023, when he was discharged. Joint Stip. 3; R. 346–47. Plaintiff was diagnosed with acute massive pulmonary embolism, acute hypoxic respiratory failure, and new onset hypertension, and was prescribed Eliquis (to prevent deep vein thrombosis and pulmonary embolism) and Amlodipine (to treat various symptoms, including chest pain, associated with coronary heart disease). Joint Stip. 3, 3 nn.4, 5; R. 346–47.

After being discharged, plaintiff received follow-up treatment at Wyckoff Heights Medical Center Clinic from various providers between September 19, 2023, and December 27, 2024. Joint Stip. 2–7.

In his first follow-up, on September 19, 2023, plaintiff reported feeling better since his hospitalization, R. 340, and his examination revealed a full musculoskeletal range of motion and no acute distress, R. 342, 344.

In his second follow-up, on October 26, 2023, plaintiff reported worsening back pain, R. 871, and denied shortness of breath, chest pain, and heart palpitations, but reported sometimes having difficulty bending due to back pain and resultant stiffness and having to stay in bed, R. 876. A Functional/Cognitive Screening showed plaintiff had normal cognition, activities of daily living, and ability to walk, and had no difficulty completing errands alone. R. 879. A physical examination revealed plaintiff was not in acute distress, had no swelling, and was alert and oriented with logical and goal-directed thought processes. R. 878–79. Plaintiff was able to walk normally. R. 879.

In his third follow-up, on November 15, 2023, plaintiff again reported back pain, which he described as "sharp but non-radiating," but reported no tingling or numbness. R. 865. A physical examination revealed that plaintiff was not in acute distress, and he was alert, oriented, and cooperative, with good eye contact and clear speech. R. 867. While

plaintiff had no swelling, he did have tenderness to palpation over the paravertebral muscles on the right, as well as limited spine motion in all planes. R. 867. Plaintiff was able to walk normally. R. 868. At this appointment, plaintiff was diagnosed with low back pain and advised to start physical therapy. R. 868.[2] Additionally, X-rays of plaintiff's spine revealed degenerative disc changes prominent at L5-S1, facet arthropathy of the lower lumbar disc space levels, maintained vertebral body heights, and intact alignment. R. 860.

In his fourth follow-up, on February 27, 2024, plaintiff reported continued back pain and denied having any depression symptoms. R. 846–47, 855. A Functional/Cognitive Screening indicated that plaintiff had normal cognition, activities of daily living, and ability to walk, and he had no difficulty completing errands alone. R. 855. As in previous follow-ups, a physical examination revealed that plaintiff showed no signs of acute distress or neurological deficits, that he had normal affect, rate of speech, and coherency, R. 853, and that his cognition and ability to walk were normal as well, R. 855.

In his fifth follow-up, on March 21, 2024, plaintiff denied having any symptoms of depression, anxiety, pain, or discomfort. R. 834–36. That same day, plaintiff presented for vascular surgery. R. 1270. His cognition and ability to walk were normal, and he reported normal activities of daily living, including having no difficulty completing errands alone. R. 1276.

---

[2] Plaintiff attended a physical therapy session on November 24, 2023, where he reported pain when bending forward, standing from a sitting position, standing, and walking. R. 1668. At that appointment, plaintiff reported that he was able to independently groom, dress, cook, clean, do laundry, and shop. R. 1669.

In his sixth follow-up, on May 7, 2024, plaintiff reported lower back pain, R. 1290, but denied any other symptoms, R. 1293. A physical examination revealed no swelling and no acute distress. R. 1294. A Functional/Cognitive Screening indicated that plaintiff had normal cognition, activities of daily living, and ability to walk, and that he had no difficulty completing errands alone. R. 1295.

In his seventh follow-up, on August 6, 2024, plaintiff reported back pain but did not report any other symptoms. R. 1598, 1604. Similar to his May 7, 2024 appointment, plaintiff showed normal cognition, ability to walk, and ability to complete errands alone. Plaintiff denied feelings of depression or anxiety. R. 1599. Upon physical examination, he displayed no swelling, and had appropriate affect and mood. R. 1606.

In his eighth follow-up, on September 19, 2024, plaintiff again reported back pain. R. 1617. He also reported leg pain and trouble breathing, R. 1622. Plaintiff described the leg pain as a sharp pain that was exacerbated by walking, R. 1622, but also reported that he could walk many blocks without chest pain or shortness of breath, and before any leg pain began to set in. R. 1622. A physical examination revealed swelling and tenderness in plaintiff's right leg. R.1623. Plaintiff was diagnosed with deep vein thrombosis in that leg, prescribed compression stockings, and referred to hematology. R. 1623–25.

In his ninth follow-up, on November 5, 2024, plaintiff reported back pain "that increase[ed] with each movement" and no other symptoms. R. 1590. A physical examination revealed nothing out of the ordinary, and plaintiff had no swelling or neurological deficits. R. 1592–93.

In his tenth follow-up, on December 19, 2024, plaintiff again reported back pain and leg pain. R. 1578. He had been walking every day "without difficulty" but had not been wearing his compression stocking as prescribed. R. 1578. A physical examination revealed

that plaintiff had full range of motion in his upper and lower extremities, and had no swelling, but that he was experiencing tenderness in his right calf. R. 1580. Plaintiff exhibited normal coordination, balance and normal motor skills, as well as normal affect, rate of speech, and speech coherency. R. 1581.

In his eleventh follow-up, on December 27, 2026, plaintiff was reported as "restricted from physically strenuous work" but "able to carry on normal activity." R. 1552. Plaintiff was reportedly able to walk, bathe, and dress. R. 1552–53.

*A. Dr. Atoynatan's Opinion*

Dr. Atoynatan is an examining consultant for the Commission with a Ph.D. in pediatrics. R. 823. On December 2, 2023, Dr. Atoynatan examined plaintiff in connection with his application for benefits. R. 820–23. During the examination, plaintiff stated that he had a history of pulmonary embolism, deep vein thrombosis ("DVT"), hypertension, prediabetes mellitus, asthma, migraines, and lower back pain. R. 820. Plaintiff reported that, at that time, he was cooking twice a week, cleaning once a week, doing laundry once a week, and shopping once a month, and that he showered and dressed himself daily. R. 821. Upon visually examining plaintiff, Dr. Atoynatan observed "no acute distress," a "normal" gait, and no use of an assistive device. R. 821. Dr. Atoynatan said that plaintiff could do "some heel to toe walking, but with difficulty," and that plaintiff needed no help dressing himself nor getting on or off of the examination table. R. 821. Dr. Atoynatan noted that plaintiff was "[a]ble to rise from [his] chair without difficulty" and that his "[c]ooperation and effort were good." R. 821. Dr. Atoynantan's physical examination revealed that plaintiff's cervical spine had "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally" and that there were no signs of "scoliosis, kyphosis, or abnormality in [plaintiff's] thoracic spine." R. 822. Dr. Atoynatan observed

"[l]umbar spine flexion [of] 45 degrees, full extension, lateral flexion [of] 20 degrees right and left [], and full rotary movement bilaterally." R. 822. Plaintiff had "[f]ull [range of motion] of shoulders, elbows, forearms, wrists, and fingers" as well as "hips, knees, and ankles bilaterally." R. 822. Plaintiff showed "[n]o joint deformity, subluxation, contractures, or ankylosis[,] no[r] joint heat, redness, swelling, or effusion." R. 822. Dr. Atoynatan concluded that plaintiff had "moderate limitation for bending, heavy lifting, carrying, prolonged standing, prolonged sitting, and prolonged walking secondary to lumbar spine problems[,]" should avoid "smoke, dust, respiratory irritants, and other known respiratory allergens," and may have "scheduled interruptions due to [his] migraines." R. 823.

*B. Dr. Peguero's Opinion*

Dr. Peguero is an examining consultant for the Commission with a doctorate in psychology. R. 1256. On April 10, 2024, Dr. Peguero examined plaintiff in connection with his application for reconsideration on his initial application for benefits. R. 1252. During the examination, plaintiff described symptoms of disturbed sleep, increased appetite with weight gain, dysphoric moods, fatigue, loss of usual interests, social withdrawal, flashbacks of childhood trauma, hypervigilance, and avoidance of certain places. R. 1252–53. Plaintiff denied a history of panic attacks but did note an episode of panic before having surgery; he described his cognitive functioning as "okay." R. 1253. Plaintiff also reported that he could bathe and groom himself, but that he had some difficult dressing, specifically putting on socks and shoes, because of his "right side limitations." R. 1254. Plaintiff said that his sister helped him with dressing, laundry, shopping and cooking, but that he could prepare simple foods and manage his finances. R. 1254.

Dr. Peguero conducted a mental status examination and concluded that plaintiff's demeanor was cooperative, his manner of relating was fair, and his affect was dysphoric. R. 1253. Dr. Peguero observed that plaintiff's attention and concentration was "mildly impaired" and that he exhibited "difficulties with focus." R. 1254. Dr. Peguero opined that, while there was no evidence of limitation in plaintiff's ability to understand, remember, or apply simple directions and instructions, there was evidence of moderate limitation as to plaintiff's ability to understand, remember, or apply complex directions and instructions. R. 1255. Dr. Peguero also opined that there was evidence of "mild limitation in using reason and judgment to make work-related decisions" as well as evidence of "moderate to marked limitation in interacting adequately with supervisors, coworkers, and the public." R. 1255. And Dr. Peguero found evidence of "moderate limitation in sustaining concentration and performing a task at a consistent pace." R. 1255. Similarly, Dr. Peguero found evidence of "moderate to marked limitation in sustaining an ordinary routine and regular attendance at work" and evidence of "moderate limitation in regulating emotions, controlling behavior, and maintaining well being." R. 1255. Finally, Dr. Peguero found evidence of "mild to moderate limitation in maintaining personal hygiene and appropriate attire." R. 1255. Dr. Peguero diagnosed plaintiff with post-traumatic stress disorder ("PTSD") and unspecified depressive disorder, for which he recommended individual psychological therapy. R. 1255.

*C. Dr. Putcha's Opinion*

Dr. Putcha is a state agency consultant with a specialty in orthopedics. *See* R. 65. On February 1, 2024, Dr. Putcha reviewed medical records and evidence in plaintiff's file, including Dr. Atoynatan's evaluation, in connection with his initial benefits application. R. 65; Joint Stip. 9. Dr. Putcha concluded that while plaintiff's medically determinable

impairments "could have reasonably been expected to produce the alleged symptoms" of pain and shortness of breath, plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] generally not consistent with the evidence of record." R. 65. Dr. Putcha concluded therefore that plaintiff's impairments were not severe. R. 65.

*D. Dr. Periakaruppan's Opinion*

Dr. Periakaruppan is a state agency psychiatry consultant with a specialty in surgery. R. 74. On April 22, 2024, Dr. Periakaruppan examined records and evidence in plaintiff's file in connection with his application for reconsideration on his initial benefits application, including medical records from plaintiff's October 26, 2023, November 15, 2023, and February 27, 2024, visits to the Wyckoff Heights Medical Center Clinic. R. 74; *see* Joint Stip. 9. Dr. Periakaruppan found that plaintiff could perform a range of light exertional work, including occasional lifting and/or carrying up to 20 pounds; frequent lifting and/or carrying up to 20 pounds; standing and/or walking (with normal breaks) for a total of about six hours in an 8-hour workday; and sitting (with normal breaks) for a total of about 6 hours in an 8-hour workday. R. 72. Dr. Periakaruppan found that plaintiff could frequently climb, stoop, and crawl, and had no limitations in balancing, kneeling, crouching, or crawling. R. 72–72. Dr. Periakaruppan also found that plaintiff needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other such respiratory irritants. R. 73.

*E. Dr. Juriga's Opinion*

Dr. Juriga is a state agency consultant with a specialty in psychology. R. 71. On May 13, 2024, Dr. Juriga examined records and evidence in plaintiff's file in connection with his application for reconsideration on his initial benefits application, including Dr.

Peguero's evaluation. R. 70–71. Dr. Juriga concluded that Dr. Peguero's opinion was "an overestimate of the severity of [plaintiff]'s restrictions/limitations." R. 72.

*F. Hearing Testimony*

At the Hearing, while represented by counsel, plaintiff testified that he has lower back pain that makes it difficult for him to bend down. R. 48. Plaintiff said that the blood clot in his right leg causes pain and swelling, and as a result, he "can't really walk too much" or travel on his own. R. 48. Plaintiff testified that he frequently elevates his leg when he is sitting or lying down, but that he can only sit for about 15 minutes at a time. R. 49, 53. Plaintiff stated that he could stand for thirty minutes at a time and that he could lift about "ten [or] 15 pounds" but "not for long." R. 53–54. Plaintiff spends roughly "six hours a day" lying down. R. 53. Plaintiff also testified that he gets "three [to] four" migraines per week. R. 61.

Plaintiff testified that if he needs to travel, his sister often drives him. R. 47–48. He testified that his sister also helps with many of his activities of daily living, including cooking, laundry, and cleaning. R. 55. Plaintiff said that he could do "some cleaning" but "not without help[.]" R. 55. Similarly, he said that he could do "a little bit of cooking." R. 55.

An impartial vocational expert ("VE"), Theresa Hopkins, also testified at the Hearing. R. 45–47, 56–60. The VE testified that a hypothetical individual who had the same vocational profile and work limitations as the plaintiff could not perform plaintiff's past work. R. 56.[3] Ms. Hopkins testified that such an individual could perform certain

[3] The ALJ described the hypothetical individual as one "who is capable of light work" and can "occasionally climb ramps and stairs, but [] cannot climb ladders, ropes, or scaffolds[,] . . . occasionally stoop, kneel, crawl and crouch;" who would need to "avoid

light and unskilled work, including work as a cashier, a marker, or a routing clerk. R. 55–56. The VE testified that a hypothetical individual who was further limited by the need to shift positions at 15-minute intervals would not be able to work as a marker, but could perform the other two jobs, and could also work as a mail clerk. R. 57. The VE testified that if the hypothetical individual was limited instead by the need to shift positions at 30-minute intervals, they could nonetheless work as a cashier, routing clerk, or mail clerk. R. 57–58. The VE said that such an individual could perform these jobs even if they were further limited to sitting no more than four hours total and standing/walking no more than four hours total in an 8-hour workday, clarifying that those who work in these jobs "don't really walk." R. 58. The VE agreed that an individual who was limited to "performing simple tasks, making simple work-related decisions and adapting to occasional workplace changes" could also do these jobs. R. 58. The VE stated that an individual who was further limited by the need to elevate his legs above waist level when sitting could not perform any jobs. R. 59. Finally, the VE said that an individual who was off-task more than ten percent of the day or one who missed work more than once a month would not be able to maintain any of the referenced jobs. *See* R. 59.

### *G. Procedural Background*

On February 7, 2025, the ALJ issued a written opinion finding that plaintiff "ha[d] not been under a disability within the meaning of the Social Security Act since September 11, 2023[.]" R. 17. Plaintiff requested review of the ALJ's decision by the Social Security Administration Appeals Council, which declined review. R. 5. Plaintiff filed this appeal of

---

exposure to unprotected heights and hazardous machinery[ as well as] standing or walking on narrow, slippery, or moving surfaces[;]" and who can "never work in poorly ventilated areas and [] tolerate no more than occasional exposure to extreme heat, cold, humidity, and atmospheric conditions[.]" R. 56.

the Commissioner's decision in November 2025. *See generally* Compl. Plaintiff moved for judgment on the pleadings pursuant to Rule 12(c); the Commissioner filed a cross-motion for the same relief. *See* Mot.; Cross-Mot.

**STANDARD OF REVIEW**

A district court reviewing a final decision of the Commissioner is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."[4] 42 U.S.C. § 405(g); *see also* Fed. R. Civ. P. 12(c) (allowing courts to enter a judgment on the pleadings). Nonetheless, federal judicial review is "limited." *Rubin v. Martin O'Malley, Comm'r of Soc. Sec.*, 116 F.4th 145, 154 (2d Cir. 2024). Reviewing courts "do not substitute" their own "judgment for the agency's" or review the record *de novo*. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). Instead, a district court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Rubin*, 116 F.4th at 154.

In conducting this review, courts must determine (1) "whether the correct legal standards were applied," and (2) "whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Rucker v. Kijakazi*, 48 F.4th 86, 90–91 (2d Cir. 2002). Whether the record contains "substantial evidence" depends on whether "a reasonable mind might accept" the evidence "as adequate to support" the ALJ's determination.

4 Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

*Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019); *see id.* at 102 (explaining that "[t]he phrase substantial evidence is a term of art used throughout administrative law to describe how courts are to review agency factfinding"). The "threshold for such evidentiary sufficiency is not high"; it requires only that the record contain "more than a mere scintilla" of evidence. *Id.* at 103. A reviewing court must uphold the Commissioner's conclusion so long as it is supported by a "rational interpretation" of the evidence. *Rubin*, 116 F.4th at 155. However, courts must still "examine contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.*

"Before determining whether the Commissioner's final decision is supported by substantial evidence[,] the court must first be satisfied that the ALJ completely developed the administrative record." *Kelly v. Comm'r of Soc. Sec.*, No. 20-cv-05318, 2024 WL 5120051, at *9 (E.D.N.Y. Dec. 16, 2024). The ALJ has a "well-established" obligation to investigate and develop the record, even where a claimant is counseled—this "has been described as a bedrock principle of Social Security law." *Id.* An ALJ can take steps to further develop the record by, inter alia, "re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others." *Bryant v. Comm'r of Soc. Sec.*, No. 20-cv-06933, 2022 WL 17540581, at *13 (S.D.N.Y. Nov. 21, 2022), *report and recommendation adopted*, 2022 WL 17540540, at *1 (Dec. 6, 2022) (citing 20 C.F.R. §§ 404.1520b, 416.920b). Where the presiding ALJ did not apply the correct legal standard or sufficiently develop the record, a court may remand the case for further proceedings. *See Sczepanski v. Saul*, 946 F.3d 152, 161–62 (2d Cir. 2020); *Daniels v. Kijakazi*, 617 F. Supp. 3d 180, 195 (S.D.N.Y. 2022).

## DISCUSSION

### I. Statutory and Regulatory Disability Benefit Requirements

The Social Security Administration administers social security disability insurance benefits to eligible applicants pursuant to the Social Security Act ("SSA"). *See generally* 42 U.S.C. § 301 et. seq. To secure benefits, an applicant must demonstrate, among other things, that he is disabled. For purposes of social security disability insurance benefits, disability is defined as an impairment or combination of impairments that renders an individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The Commissioner, acting through a presiding ALJ, assesses whether an applicant's impairments or combination of impairments meets the statutory definition of disability by undertaking a "five-step sequential evaluation process." 20 C.F.R. § 404.1520(a)(4). The Commissioner only advances to the next step of the evaluation process where the determination of an applicant's disability status cannot be made at that stage. *Id.*

The first step in this process is to evaluate the applicant's current work activity; a disability determination will be denied where an applicant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At the second step, the Commissioner "considers the medical severity of the claimant's impairment or combined impairments." *Rubin*, 116 F.4th at 147 (citing 20 C.F.R. § 404.1520(a)(4)(ii)). At the third step, the Commissioner considers whether the applicant's impairment "meets or equals" one of the listings in Appendix 1 of Part 404, Subpart P ("Listed Impairment"). 20 C.F.R. § 404.1520(a)(4)(iii). If the applicant's impairments do not meet or equal a Listed

Impairment, the Commissioner determines the claimant's residual functional capacity ("RFC"), which is the claimant's ability to function in a workplace despite medical limitations "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e).

If the claimant suffers from mental impairments, the Commissioner "appl[ies] a special technique at the second and third steps of the five-step framework." *Kelsey v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 437, 445 (W.D.N.Y. 2018) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Specifically, the Commissioner's regulations require that the ALJ determine whether the claimant has medically determinable mental impairments and, if so, "rate the degree of functional limitation resulting from the impairment(s)" across "four broad functional areas" specified in the Commissioner's regulations. *Kohler*, 546 F.3d at 226 (quoting 20 C.F.R. § 404.1520a(b)(2)). The so-called paragraph B criteria include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *See* 20 C.F.R. § 404.1520a(c)(4). The ALJ rates the degree of limitation in each functional area on a five-point scale: none, mild, moderate, marked, and extreme. *Kathryn A. v. Comm'r of Soc. Sec.*, No. 22-cv-01392, 2023 WL 8596012, at *7 (D. Conn. Dec. 12, 2023) (citing 20 C.F.R. § 404.1520a(c)(4)). In order to "satisfy the [p]aragraph B criteria, a claimant's mental disorder must result in extreme limitation of one, or marked limitation of two, of the four criteria." *Monica L. v. Comm'r of Soc. Sec.*, No. 19-cv-01435, 2021 WL 630909, at *4 (W.D.N.Y. Feb. 18, 2021).

At the fourth step, the ALJ assesses whether the claimant can perform past relevant work when considering the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot perform his past relevant work, the fifth and final step is to consider

whether an applicant, given her RFC, age, education, and work experience, can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). The claimant "bears the burden of proof in the first four steps of the sequential inquiry[.]" *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). However, at step five, "the burden shifts, to a limited extent, to the Commissioner to show that other work exists in significant numbers in the national economy that the claimant can do." *Rubin*, 116 F.4th at 148.

## II. The ALJ's Determination

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 11, 2023, the date on which plaintiff applied for benefits. R. 19. At step two, the ALJ found that plaintiff had the following severe impairments: degenerative changes of the lumbar spine, asthma, history of pulmonary embolism status post thrombectomy, DVT in the right leg, and obesity. R. 19.

The ALJ also found that plaintiff's mental impairments caused no more than a mild limitation in any of the paragraph B criteria. R. 20–22. Similarly, the ALJ concluded that plaintiff's mental impairments of PTSD and unspecified depressive disorder, "considered singly and in combination," were not severe. R. 20. In reaching this determination, the ALJ considered plaintiff's lack of mental health treatment, Dr. Peguero's examination findings, plaintiff's medical records indicating normal mental status, and Dr. Juriga's opinion on plaintiff's application for reconsideration, and found that plaintiff had "no more than a mild limitation" across each dimension of the paragraph B criteria. R. 20–22.

Specifically, the ALJ noted that plaintiff's treatment notes "indicat[ed] normal alertness, intact orientation, ability to follow commands, normal memory, normal cognition, and clear speech." R. 21. The ALJ observed that while Dr. Peguero "reported a

dysphoric affect and lethargic motor behavior" he also reported "cooperative behavior, fair manner of relating, fair hygiene and grooming, adequate language skills, coherent and goal directed thought processes, and fair insight and judgment." R. 21. The ALJ also considered Dr. Peguero's observation that plaintiff exhibited "coherent and goal directed thought processes, only mildly impaired attention and concentration, ability to solve simple calculations, intact memory skills, and average cognitive functioning." R. 21. Finally, the ALJ pointed out the evidence in the record that plaintiff "often reported being independent with activities of daily living." R. 22.

The ALJ, however, rejected the portion of Dr. Peguero's opinion that found plaintiff had "moderate limitations in his ability to understand, remember, and carry out complex directions and instructions; sustain concentration and perform a task at a consistent pace; and regulate emotions, control behavior, and maintain well-being[;] . . . moderate to marked limitations in his ability to interact adequately with supervisors, coworkers, and the public and in his ability to sustain an ordinary routine and regular attendance at work[;] . . . [and] mild to moderate limitations in his ability to maintain personal hygiene and appropriate attire." R. 20. The ALJ found these portions of Dr. Peguero's opinion "not [] persuasive" because they were "not supported by Dr. Peguero's own examination findings, which indicat[ed] mostly normal findings" and because they were "not consistent with [plaintiff]'s treatment notes indicating normal alertness, intact orientation, normal affect, ability to follow commands, normal memory, normal cognition, and clear speech." R. 20.

The ALJ thus concluded that plaintiff's medically determinable mental impairments were not severe because they "caused no more than mild limitation in any of the [paragraph B criteria] and the evidence d[id] not otherwise indicate that there [wa]s

more than a minimal limitation in the claimant's ability to do basic work activities[.]" R. 21.

At step three, the ALJ found that plaintiff's impairments did not meet or medically equal the severity of a Listed Impairment. R. 22–24.

As to plaintiff's degenerative changes of the spine, the ALJ noted the lack of any "documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands" or of any "documented need for a one-handed, hand-held device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand." R. 23. The ALJ then explained that plaintiff's treatment notes "generally indicated full range of motion findings, normal extremity findings, normal strength in the upper extremities, intact sensation, normal neurologic findings, and normal coordination." R. 23. Finally, the ALJ observed that Dr. Atoynatan's examination revealed "full range of motion of the upper extremities, stable and nontender joints, normal deep tendon reflexes, 5/5 strength in the upper extremities, intact hand and finger dexterity, and 5/5 grip strength bilaterally." R. 23. The ALJ concluded plaintiff had the "ability to use either or both upper extremities to independently initiate, sustain, and complete work-related activities involving fine and gross movements" and therefore his spine impairment did not meet the requirements of listing 1.15. R. 22–23.

As to plaintiff's asthma, the ALJ noted that the record did not show the "three asthma-related hospitalizations within a 12-month period" that are required under listing 3.03. R. 23–24. Similarly, the ALJ found that plaintiff's thrombosis-related impairments did not meet the requirements of listing 7.08 due to the lack of record evidence of three thrombosis-related hospitalizations within a 12-month period. R. 24.

The ALJ also "considered the claimant's obesity and its potential effects on the claimant's other impairments when determining the claimant's residual functional capacity and when considering whether the claimant's impairments, singularly or in combination, medically equal the severity of one of the listed impairments." R. 24. Here, the ALJ pointed to plaintiff's reported "general independence with activities of daily living," his treatment notes "generally indicating appearance of no acute distress, normal respiratory findings, normal heart rate and rhythm, full range of motion findings, normal extremity findings, normal ambulation, normal strength in the upper and lower extremities, intact sensation, normal neurologic findings, and normal coordination," and Dr. Anoynatan's examination findings that plaintiff had "normal gait, ability to get on and off the exam table, ability to rise from a chair without difficulty, normal respiratory findings, full range of motion of the cervical spine, full range of motion of the upper and lower extremities, stable and nontender joints, normal deep tendon reflexes, 5/5 strength in the upper and lower extremities, intact hand and finger dexterity, and 5/5 grip strength bilaterally," as evidence "that the severity of [plaintiff's] obesity, by itself or in combination with other impairments, d[id] not meet or medically equal the requirements of any listing." R. 24.

The ALJ determined that plaintiff's hyperlipidemia and prediabetes could not be considered severe impediments because of the lack of evidence that the conditions had "caused more than a slight limitation in functioning for 12 or more consecutive months." R. 19. The ALJ explained that plaintiff had "received little treatment for the[] conditions," that there were "few to no symptoms noted in the record due to the[] conditions," and that "no doctors found any functional limitations due to the[] symptoms." R. 19.

The ALJ then determined that plaintiff retained the RFC to perform light work with certain limitations, including that plaintiff: (1) can sit for four hours and stand and/or walk for four hours in an 8-hour workday; (2) can occasionally climb ramps and stairs but cannot climb ladders, ropes, or scaffolds; (3) can occasionally stoop, kneel, crawl, and crouch; (4) must avoid exposure to unprotected heights and hazardous machinery and must avoid standing and walking on narrow, slippery, or moving surfaces; (5) can never work in poorly ventilated areas and can tolerate no more than occasional exposure to extreme heat, cold, humidity and atmospheric conditions; and (6) requires an option to alternate positions between sitting and standing at 15-minute intervals. R. 24–25. The ALJ concluded that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. R.25.

At step four, the ALJ found that plaintiff could not perform his past relevant work as a delivery truck driver based on the VE's testimony that an individual with plaintiff's RFC would not be able to perform that kind of work. R. 30. At step five, after considering plaintiff's vocational profile and RFC, the ALJ determined that plaintiff could perform other work existing in significant numbers in the national economy, including cashier, mail clerk, or routing clerk. R.31. Accordingly, the ALJ found that plaintiff was not disabled within the meaning of the SSA from September 11, 2023, through the date of the decision. R. 32.

## III. The Court's Analysis of the ALJ's Determination

Plaintiff appeals the ALJ's decision on three grounds. First, plaintiff contends that the ALJ failed to properly evaluate certain medical opinion evidence. Mot. 6. As to his

mental impairments, plaintiff argues that the ALJ erred when she failed to consider the findings, including clinical signs and symptoms, from Dr. Peguero that supported the doctor's opinion that plaintiff has moderate and moderate to marked mental limitations. Mot. 7–8. In plaintiff's view, the ALJ's "lack of explanation and discussion regarding why [she] felt comfortable in rejecting the clinical findings and supporting explanation provided by the examining mental health specialist fails the requirement that an ALJ must consider all the support provided by a medical source for the opinions offered." Mot. 8. And as to his physical impairments, plaintiff contends that the ALJ's determination that he can perform light work is "inconsistent" with Dr. Atoynatan's opinion that he had moderate limitations in standing and walking. Mot. 11–12.

Second, plaintiff states that the ALJ failed to properly evaluate his subjective statements regarding his physical and mental impairments. Mot. 13–16.

Third, plaintiff says that, even assuming that his mental impairments are not severe, the ALJ erred in her determination of his RFC when she failed to consider the combined impact of all of plaintiff's impairments—severe and non-severe—in the RFC finding. Mot. 9.

In response, the Commissioner contends that substantial evidence supports the ALJ's evaluation of the medical opinion evidence, the ALJ correctly evaluated plaintiff's subjective statements concerning his symptoms, and the ALJ correctly determined plaintiff's RFC. Cross-Mot. 9, 15, 19.

For the reasons stated below, the Court finds that the ALJ's assessment of the medical opinion evidence and plaintiff's subjective statements concerning his symptoms was supported by substantial evidence and consistent with appropriate legal standards, but that the ALJ erred in her determination of plaintiff's RFC. Thus, remand is warranted.

*A. The ALJ Properly Evaluated the Medical Opinion Evidence*

In evaluating medical opinions an ALJ must consider, among other factors: supportability, consistency, the author's relationship with the claimant, and the author's specialization. *See* 20 C.F.R. § 404.1520c(c)(1)–(5). The "most important" factors are supportability and consistency. *Rubin*, 116 F.4th at 148. Supportability of a medical opinion concerns "how well a medical source supported and explained their opinion." *Daniels*, 617 F. Supp. 3d at 189. Consistency "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record[.]" *Id*. Put differently, supportability refers to the "objective medical evidence and supporting explanations presented by a medical source to support his or her medical opinion." *Villier on behalf of N.D.D.R. v. Comm'r of Soc. Sec.*, No. 23-cv-893, 2024 WL 2174236, at *2 (2d Cir. May 15, 2024) (summary order) (quoting 20 C.F.R. § 404.1520c(c)(1)). Consistency, on the other hand, "refers to how consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other sources[.]" *Id.* (quoting 20 C.F.R. § 404.1520c(c)(2)).

The ALJ must "explain how [s]he considered supportability and consistency as applied to each medical source's opinion in h[er] determination or decision," and may not "give any specific evidentiary weight" to any particular opinion by default. *Rubin*, 116 F.4th at 148. Although an "explanation need not be exhaustive," the Court must be able to "glean the rationale of an ALJ's decision." *Jaret B. v. Comm'r of Soc. Sec.*, No. 22-cv-00896, 2024 WL 1014051, at *7 (W.D.N.Y. Mar. 8, 2024) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). An ALJ's "failure to properly consider and apply the requisite factors is grounds for remand." *Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 161 (S.D.N.Y. 2022). Similarly, if an ALJ "bases her explanation upon a

misreading of the record, remand is required." *Rivera v. Comm'r of the Soc. Sec. Admin.*, No. 19-cv-04630, 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted*, 2021 WL 134945 (Jan. 14, 2021).

Still, it is the ALJ's "role to weigh medical opinion evidence and to resolve conflicts in that evidence." *Milliken v. Saul*, No. 19-cv-09371, 2021 WL 1030606, at *8 (S.D.N.Y. Mar. 17, 2021) (first citing *Cage*, 692 F.3d at 122; and then citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). Thus, "it is not the [district] [c]ourt's function to reweigh the evidence that was before the ALJ." *Mary M. v. Comm'r of Soc. Sec.*, No. 20-cv-01594, 2022 WL 823850, at *11 (N.D.N.Y. Mar. 17, 2022). Instead, the Court's inquiry is limited to whether the ALJ applied the correct legal standards and whether substantial evidence supported her determination. *See Lee G. v. Comm'r of Soc. Sec.*, No. 19-cv-01558, 2021 WL 22612, at *5 (N.D.N.Y. Jan. 4, 2021) ("[T]he Court must not re-weigh opinion evidence so long as there is substantial evidence to support the ALJ's determination[.]"). The Second Circuit has cautioned that "[s]ubstantial evidence is a very deferential standard of review." *Nunez v. Comm'r of Soc. Sec.*, 164 F.4th 60, 70 (2d Cir. 2025). "Indeed, under the substantial evidence standard, the [Commissioner's] determination must be upheld if it is rational and supported by the record, even if the evidence is susceptible to more than one rational interpretation." *Id.*; *see also Kimberly B. v. Comm'r of Soc. Sec.*, No. 22-cv-00350, 2023 WL 3318488, at *11 (N.D.N.Y. May 9, 2023) (explaining that where "the ALJ's conclusions find reasonable support in the record, courts will defer to the ALJ's resolution regarding the appropriate weight to be afforded to various medical opinions").

*1. Plaintiff's Mental Impairments*

Here, plaintiff argues that the ALJ erred in weighing the medical opinion evidence when she "found the opinions from the Agency's own examining psychologist Dr. Peguero 'not persuasive' to the extent this expert opined that [he] has moderate and moderate to marked mental limitations." Mot. 7. Plaintiff argues that the ALJ only "referenced some normal mental status examination findings" but "did not consider [other] findings from Dr. Peguero that support[ed] [his] opinion[s]." Mot. 7–8. Specifically, plaintiff says that the ALJ ignored clinical signs and symptoms reflected in Dr. Peguero's psychological report, including: "disturbed sleep, increased appetite with weight gain, dysphoric moods, fatigue, loss of usual interests, social withdrawal, flashbacks of childhood trauma, hypervigilance, avoidance of certain places, a history of panic attacks, only fair grooming, lethargic motor behavior, a dysphoric affect, mildly impaired attention and concentration, and fair insight and judgment." Mot. 7–8 (citing R. 1252–54). Accordingly, plaintiff concludes that the ALJ did not "consider all the support provided by the medical source for the opinions offered." Mot. 8.

Plaintiff's argument is unavailing for several reasons. As a threshold matter, an "ALJ [is] not required to mention or discuss every single piece of evidence in the record." *Lewis v. Comm'r of Soc. Sec.*, No. 00-cv-01225, 2005 WL 1899399, at *6 (N.D.N.Y. Aug. 2, 2005) (collecting cases); *see Christopher W. v. Comm'r of Soc. Sec.*, No. 23-cv-01581, 2025 WL 1033788, at *4 (N.D.N.Y. Feb. 11, 2025) ("An ALJ's assessment of supportability need not be overburdensome, . . . [n]or need the ALJ discuss every piece of evidence in the record in assessing the supportability of a medical opinion."), *report and recommendation adopted*, 2025 WL 892687 (N.D.N.Y. Mar. 24, 2025). More importantly, the ALJ *did* evaluate the supportability and consistency of Dr. Peguero's

opinion as required. R. 20. In evaluating Dr. Peguero's opinion, the ALJ found persuasive the portion opining that plaintiff had no limitations in understanding, remembering, or applying simple directions and instructions and mild limitations using reason and judgment to make work related decisions, explaining it was supported by Dr. Peguero's "detailed examination findings." R. 20. Those findings included Dr. Peguero's observation of plaintiff's "dysphoric" affect, "mildly impaired" attention and concentration, and "fair" insight and judgment. R. 1253–54. The ALJ also explained that this portion of Dr. Peguero's opinion was persuasive because it was consistent with plaintiff's treatment records which indicated, without exception, that plaintiff's mental function was normal and unimpaired. R. 20. The ALJ then explained that the portion of Dr. Peguero's opinion assessing moderate and moderate-to-marked limitations was both unsupported by Dr. Peguero's "mostly normal" examination findings, and inconsistent with the record of normal mental status findings in plaintiff's other treatment records. R. 20. And the ALJ's determination on these points is sound, especially in light of the record, which indicates that plaintiff told Dr. Peguero that he had never sought mental health treatment, R. 1252, and reveals that he regularly denied any mental health symptoms. *See*, *e.g.*, R. 836, 855–56, 888, 1295, 1424, 1483, 1599, 1602, 1608-09, 1630.

Moreover, the ALJ was not evaluating Dr. Peguero's opinion in a vacuum. Dr. Juriga, who considered the evidence in the record—including Dr. Peguero's opinion—on plaintiff's application for reconsideration, opined that plaintiff's medically determinable mental impairments were not severe. R. 70–72. Dr. Juriga explained that Dr. Peguero's opinion was "an overestimate of the severity of [plaintiff]'s restrictions/limitations." R. 72. The ALJ considered and found this opinion persuasive, further supporting her own conclusion that plaintiff's medically determinable mental impairments were not severe.

In light of this record, the Court concludes the ALJ's determination that certain portions of Dr. Peguero's opinion were persuasive and that other portions were unpersuasive was a "rational interpretation" of the evidence. *Rubin*, 116 F.4th at 155.

*2. Plaintiff's Physical Impairments*

Plaintiff next argues that the ALJ's determination that plaintiff can perform light work is "inconsistent" with Dr. Atoynatan's opinion that plaintiff had moderate limitations in sitting, standing, and walking, an opinion the ALJ found persuasive. Mot. 11–13. Plaintiff does not specify how the ALJ's RFC determination is inconsistent with Dr. Atoynatan's opinion, but rather cites to authorities that all generally stand for the proposition that "light work" as defined in the regulations "involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds; (ii) requires a good deal of walking or standing, on and off, for a total of approximately six hours in an eight-hour workday, with sitting occurring intermittently at the time; or (iii) may involve sitting most of the time with pushing and pulling of arm or leg controls," 20 C.F.R. § 404.1567(b); Social Security Ruling 83-10, and may—if not further defined or limited by the ALJ—be inconsistent with a moderate sitting, standing or walking limitation, Mot. 11–13.

Plaintiff's "argument" is without merit because he fails to articulate how the ALJ's determination of the work he could do is inconsistent with the physical medical impairments she identified based on her review of the record. Moreover, the Court's review of the record reveals no such inconsistency. The ALJ thoroughly reviewed and considered the record, including plaintiff's X-ray results, Dr. Antoynatan's opinion, Dr. Putcha's opinion, and Dr. Periakaruppan's opinion, R. 25–29, and found that plaintiff could perform a range of light work "except [he] can [only] sit for 4 hours and stand

and/or walk for 4 hours in an 8-hour workday" and "requires an option to alternate positions between sitting and standing at 15-minute intervals." R. 24–25. Importantly, the ALJ rejected Dr. Putcha's opinion that plaintiff "did not suffer from a severe physical impairment" as not persuasive because he was "unable to review the entire case file." R. 27. And the ALJ rejected portions of Dr. Periakaruppan's opinion that plaintiff could "stand and/or walk for about 6 hours and sit for about 6 hours in an 8-hour workday" for that same reason. R. 28. Indeed, the VE testified that the jobs the ALJ found plaintiff could perform do not require walking, R. 58 (VE: "They don't really walk in these jobs."), and that they allow an individual to shift positions every 15 minutes, Tr. 57. Therefore, even accepting that light work classification might be inconsistent with a moderate standing or sitting limitation in some cases, "[p]laintiff has failed to establish that moderate limitations in prolonged sitting, prolonged standing, and walking preclude the performance of light work" as described by the ALJ. *George A. v. Comm'r of Soc. Sec.*, No. 20-cv-00691, 2021 WL 2102527, at *8 (W.D.N.Y. May 25, 2021).[5]

* * *

In sum, the Court finds that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's evaluation of the medical opinion evidence. Therefore, plaintiff's motion for judgment on the pleadings on this ground is denied.

---

5 Of note, the ALJ concluded that plaintiff's "history of pulmonary embolism, his continuing right leg DVT, and X-rays showing degenerative changes of the lumbar spine establish severe impairments and support limiting the claimant to performing work at an *eroded* light exertional level." R. 27 (emphasis added).

*B. The ALJ Properly Evaluated Plaintiff's Subjective Statements*

Plaintiff also takes aim at how the ALJ evaluated his subjective statements concerning his pain. Mot. 14–16. When determining a claimant's RFC, the ALJ "is required to take the claimant's reports of pain and other limitations into account." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 416.929). Still, the ALJ need not "accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.*

SSA regulations provide for a two-step process to assess the credibility of a claimant's testimony. First, the ALJ determines whether the claimant's impairment "could reasonably be expected to produce the symptoms alleged;" second, the ALJ determines whether and to what extent the claimant's reported symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Colombia B.N. v. Comm'r of Soc. Sec.*, No. 21-cv-10622, 2023 WL 358599, at *5–6 (S.D.N.Y. Jan. 23, 2023).

The ALJ followed that two-step process here. First, "[a]fter careful consideration of the evidence," the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 25. However, at the second step, the ALJ found that plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." R. 25. Specifically, the ALJ set forth an account of plaintiff's treatment notes from March 2020 to December 2024 which generally indicated no appearance of acute distress, normal respiratory findings, normal heart rate and rhythm, full range of motion findings, normal extremity findings, normal

ambulation, normal strength in the upper and lower extremities, intact sensation, normal neurologic findings, and normal coordination; Dr. Atoynatan's report indicating plaintiff's normal gait, ability to get on and off the exam table, ability to rise from a chair without difficulty, normal respiratory findings, full range of motion of the cervical spine, full range of motion of the upper and lower extremities, stable and nontender joints, normal deep tendon reflexes, 5/5 strength in the upper and lower extremities, intact hand and finger dexterity, and 5/5 grip strength bilaterally; and plaintiff's general independence with activities of daily living. R. 25–30. On this basis, the ALJ reasoned that plaintiff's statements concerning the limiting effects of his symptoms were not entirely consistent with the record. R. 29–30.

Plaintiff argues that the ALJ erred when she "referred to some normal physical exam findings [while] ignoring other abnormal findings" and "placed undue weight on evidence of [his] activities of daily living." Mot. 15. The ALJ did no such thing. In fact, the ALJ explicitly considered many of the abnormal findings that plaintiff cites, including his high blood pressure, obesity, mobility limitations, tenderness around the spine, leg swelling, and limited ability to squat. *Compare* R. 27–28, *with* Mot. 10. And plaintiff's general independence with activities of daily living was just one of several reasons the ALJ provided in support of her determination that plaintiff's testimony was not fully consistent with the evidence in the record. R. 29–30. Although plaintiff may disagree with how the ALJ discounted his statements concerning the intensity or severity of his symptoms, this disagreement is not grounds for remand. *See Linser-Parrinello v. Colvin*, No. 13-cv-04585, 2015 WL 1529833, at *12 (E.D.N.Y. Mar. 31, 2015) ("Just because [a] [p]laintiff disagrees with the ALJ's analysis of the evidence does not mean the ALJ improperly assessed the [p]laintiff's credibility."); *see also Taveras v. Comm'r of Soc.*

*Sec.*, No. 22-cv-10825, 2024 WL 687912, at *8 (S.D.N.Y. Feb. 17, 2024) ("An ALJ's evaluation as to the claimant's subjective statements about their symptoms and resulting limitations is entitled to deference by a reviewing court."); *Pardee v. Astrue*, 631 F. Supp. 2d 200, 220 (N.D.N.Y. 2009) ("[A]n ALJ retains the discretion to evaluate a claimant's subjective testimony, including testimony concerning pain.").[6]

*C. The ALJ Erred in Her Determination of Plaintiff's RFC*

Plaintiff next argues that, even assuming the ALJ did not err in her determination that his mental impairments were not severe, "she erred by not considering the combined impact of his non-severe mental impairments with his other severe impairments." Mot. 9–10. Plaintiff notes that the ALJ did not include any mental restrictions in plaintiff's RFC or discuss the impact that his mental impairments might have on the RFC determination and asserts that "this is not a case where [such an] error may be deemed harmless." Mot. 10.

Contrary to plaintiff's suggestion, Mot. 9, there is no requirement that an RFC finding "must contain some limitation to account for mild mental impairments." *Cynthia*

---

6 Plaintiff also argues that the ALJ "failed to give any reasons for not believing Mr. Arce's allegations related to his mental impairments." Mot. 15. As discussed above, the ALJ considered the symptoms plaintiff reported to Dr. Peguero and found them inconsistent with the record as a whole. R. 20. And the ALJ considered plaintiff's statements, made in the Adult Functional Reports he completed in October 2023 and April 2024, that he had difficulty with stress, concentrating, and getting along with others, and had depression due to chronic pain, but that also revealed he had no difficulty "following written or spoken instructions" and "got along well with authority figures." R. 29. Accordingly, plaintiff's argument on this point is without merit. *Jones v. Comm'r of Soc. Sec.*, No. 25-cv-04623, 2026 WL 1785189, at *3 (E.D.N.Y. June 22, 2026) ("The ALJ is not required to accept the plaintiff's subjective statements, as the ALJ has discretion to weigh the plaintiff's statements in accordance with the evidence in the record." (citing *Genier*, 606 F.3d at 49)).

*M. v. Comm'r of Soc. Sec.*, No. 23-cv-00955, 2024 WL 4289537, at *8 (W.D.N.Y. Sept. 25, 2024); *see DuBois v. Comm'r of Soc. Sec.*, No. 20-cv-08422, 2022 WL 845751, at *5 (S.D.N.Y. Mar. 21, 2022) ("When formulating a claimant's RFC, the ALJ must consider not only her severe impairments, but her non-severe impairments as well. This does not mean, however, that the ALJ must include a specific limitation in the RFC corresponding to each of the claimant's non-severe impairments. To the contrary: by definition, an impairment which is not severe does not significantly limit the claimant's physical or mental ability to do basic work activities.").

That said, the ALJ erred when she failed to discuss the combined impact of plaintiff's severe and non-severe impairments. *See Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) ("A[n] RFC determination must account for limitations imposed by both severe and non[-]severe impairments."). That is because "even if the RFC need not include any restrictions based on the claimant's mild mental impairments, the ALJ must still expressly consider those mild impairments and discuss how the step four analysis accounted for them. *Dejesus v. Comm'r of Soc. Sec.*, No. 24-cv-09435, 2026 WL 1219375, at *8 (S.D.N.Y. May 4, 2026). To "expressly consider" a claimant's mild impairments, *id.*, the ALJ must do more than provide cursory statements that she "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's [RFC]," and that the "[RFC] assessment reflects the degree of limitation the [ALJ] has found in the paragraph B mental function analysis" conducted at step two of the sequential evaluation process. R. 22. Those are precisely the types of statements courts have rejected as "lip service" that is "insufficient to satisfy the legal requirement that the RFC assessment include a narrative discussion describing how the evidence *supports each conclusion*, citing specific medical facts (e.g., laboratory findings)

and nonmedical evidence (e.g., daily activities, observations)." *MacDonald v. Comm'r of Soc. Sec.*, No. 17-cv-00921, 2019 WL 3067275, at *3 (W.D.N.Y. July 11, 2019). Indeed, the "analyses of impairments when determining severity at step two and when later formulating the claimant's RFC are related but distinct." *Coulter v. Comm'r of Soc. Sec.*, 673 F. Supp. 3d 365, 375 (S.D.N.Y. 2023).

Here, at step two, the ALJ provided a thorough analysis of plaintiff's mental impairments, PTSD and unspecified depressive disorder. R. 20–22. The ALJ noted that plaintiff's treatment notes "generally indicated normal findings including normal alertness, intact orientation, normal affect, ability to follow commands, normal memory, normal cognition, and clear speech." R. 20. The ALJ then analyzed Dr. Peguero's opinion, finding it "persuasive" to the extent based on Dr. Peguero's objective observations that plaintiff had a "dysphoric affect and lethargic motor behavior" but otherwise appeared "normal or close to normal." R. 20. The ALJ also reviewed and found persuasive Dr. Juriga's opinion that plaintiff had "mild limitations in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." R. 20. Finally, the ALJ analyzed each functional area of the paragraph B criteria and found that plaintiff "has a mild limitation" with respect to each one. R. 21–22.

When determining plaintiff's RFC, however, the ALJ failed to mention any mental limitations, mild or otherwise, and did not explain why she concluded that his mild mental health limitations did not result in any such limitations within the RFC. R. 25–30. The ALJ acknowledged that "a more detailed assessment" is needed at step four compared to step two, R. 22, but made "only conclusory references to having considered the limits in step two to determine the RFC at step four," *Dejesus*, 2026 WL 1219375, at *7.

Therefore, "[t]he Court is [] left to speculate regarding why the RFC does not include any mental limitations, and by extension whether the RFC is supported by substantial evidence," *Sharon J. v. Comm'r of Soc. Sec.*, 716 F. Supp. 3d 59, 65 (W.D.N.Y. 2024). Absent "evidence that these impairments contributed to *any* functional limitations," this error "may [have] been considered harmless." *Smith v. Comm'r of Soc. Sec.*, No. 20-cv-08547, 2022 WL 421136, at *15 (S.D.N.Y. Feb. 11, 2022). Here, that is not the case, R. 21–22, and "[r]emand is required[,]" *Dejesus*, 2026 WL 1219375, at *8 (collecting cases and explaining that "where the non-severe mental impairments are found to cause even mild functional limitations, a district court should remand because it cannot determine whether the ALJ's RFC determination is supported by substantial evidence without discussion of these mild limitations").

The Commissioner points to the ALJ's colloquy with the VE at the hearing regarding plaintiff's ability to perform jobs classified as unskilled work, R. 58, and her reference to plaintiff's statements that he "had difficulty with stress, concentrating, and getting along with others, and had depression due to chronic pain," Cross Mot. 20 (citing R. 29), as evidence that "the record as a whole shows that [s]he did evaluate [plaintiff's] impairments and their possible limiting effects." Cross Mot. 20 n. 7.[7] But this argument

---

7 The Court notes that the Commissioner's citations on this point are unavailing. First, the ALJ in *Spinato v. Comm'r of Soc. Sec.*, concluded—and stated—that the claimant's non-severe impairments "did not result in any continuous functional limitations," No. 20-cv-03952, 2023 WL 8565536, at *5 (E.D.N.Y. Dec. 11, 2023), a conclusion absent in this case, *see* R. 20–22 (concluding plaintiff "has mild limitation" in each of the four paragraph B criteria). Second, cases that stand for the uncontroversial propositions that a "court can look to other parts of an ALJ's decision in concluding that individual findings are supported" or affirm an ALJ's decision where their "rationale can be gleaned from the record," are not helpful in answering the question presented here, which is whether a district court can conclude that an RFC determination is based on substantial evidence where it is devoid of discussion as to whether previously identified

is of no help because the ALJ's "consideration of [plaintiff]'s mental impairments stopped with those observations." *James D. v. Comm'r of Soc. Sec.*, No. 23-cv-01056, 2026 WL 835515, at *3 (W.D.N.Y. Mar. 26, 2026). She did not, as was required, address whether the mild impairments she identified along each of the paragraph B criteria "might affect [plaintiff]'s ability to work in any way." *James D.*, 2026 WL 835515, at *3; *see* R. 25–30. Accordingly, remand is required. *Coulter*, 673 F. Supp. 3d 365, 377 (S.D.N.Y. 2023) (collecting cases and observing that "even where substantial evidence supports the ALJ's finding that a claimant's mental impairment was non[-]severe, it would still be necessary to remand for further consideration where the ALJ failed to account for the claimant's mental limitations when determining her RFC.").

On remand, the ALJ shall explain how the mild limitations that she found at step two factor into her determination of plaintiff's RFC at step four. The Court expresses no view as to whether those limitations require any modification of the ALJ's conclusion regarding plaintiff's RFC or if so, how that would affect his final determination.

---

medically determinable mental impairments that result in mild limitation to the claimant affect said determination.

## CONCLUSION

For the reasons stated above, the Court remands this action to the Commissioner for reconsideration at step four in accordance with this order. Plaintiff's motion for judgment on the pleadings is **GRANTED** to the extent of the remand and **DENIED** in all other respects. The Commissioner's motion is **DENIED** to the extent of the remand and **GRANTED** in all other respects.

The Clerk of Court is respectfully directed to enter judgment and to close the case.

**SO ORDERED.**

*/s/ Natasha C. Merle*
NATASHA C. MERLE
United States District Judge

Dated: October 9, 2026
Brooklyn, New York